'BONER *v.* MAHLE.

The privilege of the vendor is not required to be expressly stipulated; it springs from the nature of the debt, and exists by force of law, unless renounced. The renunciation need not be express, it may be implied from the terms of the instrument; but the intention to renounce must not be doubtful; it must be clearly deducible from the language of the parties.

The mere omission to stipulate a special mortgage, cannot be considered a renunciation of the higher right of privilege ; nor can such a renunciation be inferred where the omission to take a special mortgage is accompanied by the granting of a mortgage upon other property; nor, where a special mortgage has been taken, will its subsequent release affect the creditor's privilege.

An interpretation of contracts based upon presumed ignorance of the law by the parties, is inadmissible.

The recital in an act of sale that the purchaser, "in order to secure the payment of the notes for the price, hereby mortgages " certain property previously belonging to him, cannot be considered as evidence of an implied release of the creditor's privilege.

Where a written act of sale is unambiguous, and, by its legal effect, confers the vendor's privilege, parol evidence is inadmissible to establish that the parties intended that no such privilege should exist. C. C. 2256.

Children of a female slave born since the sale of the mother, are subject to the vendor's privilege. C. C. 183, 491, 539, 557. Stat. of 7 June, 1806, ss. 9, 10.

The purchaser of slaves under a *vente à reméré* does not become the owner of the children born of the slaves purchased, during his possession under the contract; the vendor, when he exercises his right of redemption, is entitled to reclaim them as owner. So on the resolution of a sale of slaves, at the suit of the vendor, he is entitled to take back the offspring born since the sale.

APPEAL from the District Court of Caddo, *Taylor,* J.

*Spofford,* for the plaintiff. The plaintiff has the privilege of a vendor. C. C. 3216. The taking of a special mortgage on other property is not a waiver of it. *Howard* v. *Thomas,* 3 La. 111. 3 Rob. 216. 12 Rob. 279. The law being so settled here, it is immaterial that the opposite doctrine was held in Rome, France, or England. Troplong, Privil. v. 1, § 199. 2 Story's Eq. Juris. § 1224. The privilege was preserved by registering the sale. 2 La. 577. Parol evidence to show a renunciation of the privilege is inadmissible. C. C. 2255, 2256, 1842, 2498, 1757 § 2. 2449, 2477, 2496. 8 Taunton, 97. As between vendor and vendee the privilege of the former extends to the young of slaves sold, born after the sale. *Partus sequitur ventrem.* C. C. 490 *et seq.,* 537, 539, 196, 3278. Greiner's Dig. arts. 3370, 3371, 3496. Code Nap. 2133, and Rogron's Com. on it. Troplong, Hyp. v. 2, p. 365, &c. White's New Recop. v. 1, p. 141. Mor. and Carleton's Partidas, v. 1. p. 371. If by the resolutory condition implied in every sale, the vendor, on the dissolution of the sale on the failure of the purchaser to pay the price, is entitled to all the natural fruits that have accrued since the sale (C. C. 2040, 3041, 2539), it would seem that he should not be placed in a worse position where he exercises the concurrent remedy afforded by his privilege as vendor.

Persil, Reg. Hyp. p. 64, sec. 2. no. 2.  C. C. 3135.· The roman law supports plaintiff's position on these questions.

" V. G.  Quæ ex re pignerata apud eum qui eam obligavit nascuntur; hujus rei pignori accedunt.

" Item Paulus : Si mancipia in causam pignoris ceciderunt, ea quoque quæ ex his nata sunt, eodem jure habenda sunt." Pandects, by Pothier. v. 7. p. 493.

*Elgee*, for the defendant.  This action is in the nature of an hypothecary action against *Mahle*, as the possessor of certain slaves on which the plaintiff alleges that his privilege, as a vendor, rests.  The defendant avers that no such lien was reserved, but, on the contrary, at the time of the sale, was abandoned, in consideration of a special mortgage given on other and distinct property, to secure the full amount due ; that, if the abandonment be not inserted expressly in the deed, the omission occurred through the neglect of the notary, and that plaintiff, availing himself of such an omission, is fraudulently attempting to enforce a right which he had abandoned.  To prove the renunciation of this right, the defendant, in the lower court, offered the parol testimony of the notary who drew up the act of sale, which evidence that tribunal refused to receive.  The decision of this case rests upon the question, whether this evidence be, or be not, admissible.  The plaintiff bases his objection upon the 225th art. of the Civil Code, averring that the evidence offered contradicts the deed.

The article referred to does not establish a principle peculiar to our jurisprudence.  It is a well settled principle that, parol testimony shall not be admitted to contradict the deed.  The deed must speak for itself.  But it is manifest that this rule cannot be extended so as to embrace matters not set forth in the deed.  Thus, in the present case, had the parties to the act of sale stipulated that the lien of the vendor should be retained, no parol proof could be admitted to contradict the solemn and express agreement.  But the deed is silent upon this point, and the parties may or may not have agreed to retain or abandon it; therefore the testimony does not contradict the deed.

But the plaintiff urges that the lien of the vendor is a legal consequence of the deed ; that its retention is presumed by law; and that, therefore, a renunciation of it must be express.  The defendant does not admit the legal accuracy of the statement, that the vendor's lien is a consequence of the deed.  But admitting, for the sake of argument, that it is, does it follow, *ex necessitate*, that renunciations of such legal rights must be express?  Not at all.  In France, where the very highest regard is paid to privileges, it is admitted that they may be either expressly or tacitly renounced.  Vide Troplong, Bruss. Edit. Priviléges p. 191, no. 868.  Persil, Reg. Hypothécaire, p. 273, no. 15.  Guichard, Reg. Hyp. vol. 4, p. 241.  See also the authorities of Caius and Ulpian, *loco citato*.  If the renunciation of a privilege can be legally inferred from the silent testimony of surrounding facts and circumstances, with how much more of reason will not direct evidence be admissible.

Whilst the rule of law is rigidly adhered to in England, and the States of this Union, that parol evidence is not admissible to contradict written instruments, the rule is no less well settled, that contracts which arise by operation of law are exempted from it.  In the case of the *Susquehanna Bridge* v. *Evans*, 4 Wash. C. C. R. p. 480, Judge Washington says: " The reasons which forbid the admission of parol evidence to alter or explain written agreements and other instruments, do not apply to those contracts implied by operation of law."  See also Wharton's Dig. p. 254.  3d. Sergt. and Rawle, p. 609.  5 Ib. p. 363.

The apparent difficulty in deciding this question seems to arise from the impression, erroneous in itself, that the lien or privilege is an inherent part of the deed.  The plaintiff is seeking to enforce a privilege.  What is a privilege ? A right, arising not from the deed, but from the nature of the debt.  C. C. art. 3153.  The debt can exist without the deed ; *ergo*, the privilege which arises from the debt can also exist without the deed.  Had a verbal sale of the slaves taken place, the vendor s lien would certainly have existed as between the parties, and could have been enforced at law.  The deed in this case affords written evidence of the nature of the property sold, and the price which was to be paid for it; and, so far, it cannot be contradicted by the parties thereto.  But it is silent as to what may have been the agreement or understanding in relation to the privilege of the vendor.  The admission of parol evidence in all cases is the general rule, only restrained or inhibited in such cases as the law-maker has pointed out.  Thus, if there be no express prohibition against the receiving of parol testimony to rebut a legal presumption, it must be admitted.  See Starkie on Evidence.

The authorities adduced in the lower court by plaintiff do not meet this question.

11 Rob. p. 20. *Jewett's* case arose on a question of priority of prescription.

12 Rob. p. 280. *Citizens' Bank* v. *Cuny et al.* decides that the relinquishment of the special mortgage did not include that of the vendor's lien, particularly as in the relinquishment of the former, the vendor had stated, at the same time, on the records, that no part of the price had been paid.

3 La. p. 112. *Howard* v. *Thomas.* In this case the vendee put interrogatories to the vendor, to know whether he had not agreed to renounce his lien as vendor, to which he was answered in the negative. These answers were not sought to be disproved, and judgment was rendered accordingly, recognizing the lien of the vendor.

2 La. p. 575. *Moore* v. *Louaillier,* has no relation to the case at bar. It merely decides that where the office of parish and probate judge are united in the same person, that it is indifferent how he styles himself in the filing of the instruments in his office.

3 Rob. p. 216. *Succession of Johnson.* The court held that, in cases of doubt, the lien of the vendor would be recognized; but admit that, if the question were *res nova,* they would hesitate before deciding that, at least as to third parties, the privilege was retained.

Amongst the facts and circumstances surrounding this transaction as indicative of the intention of the parties to abandon the vendor's lien, one cannot fail to be struck with the peculiar language of the deed of sale of the slaves. After reciting the terms of sale, and setting forth the note which was given, the notary proceeds—" and now in order to secure " etc., indicative certainly of the idea that, the mortgage recited subsequently was the sole, substantive security to be given. If it had been considered additional, would not the notary have used the language " more fully to secure."

The judgment appealed from is clearly erroneous in decreeing the vendor's lien to rest upon the slaves set forth in the petition, upon referring to which we find that the plaintiff claims that the original slaves and their increase, be sold, etc. Legal ingenuity can scarcely go so far as to affect property yet in the womb of time with the lien of the vendor. Persons not yet born can scarcely be considered objects of commerce.

The judgment of the court was pronounced by

SLIDELL, J. The plaintiff seeks to enforce the vendor's privilege upon certain slaves, in the possession of the defendant. The defendant avers that no such privilege was reserved ; but, on the contrary, at the time of the sale, was abandoned by the plaintiff, in consideration of a special mortgage being given him on other and distinct property, to secure him in the full amount of the price not paid in cash ; that, if the abandonment was not inserted expressly in the deed of sale, the omission occurred through the " remissness, negligence, or perhaps ignorance " of the notary, who drew up the act; that the plaintiff, availing himself of such omission, is fraudulently attempting to enforce a right which he had abandoned.

To prove the renunciation of the vendor's privilege, the defendant offered, in the lower court, the parol testimony of the parish judge, who, in his capacity of notary, drew up the act of sale, and before whom it was executed, to prove what was said at the time by the parties. The court refused to receive the testimony, and to that refusal a bill of exceptions was taken. The defendant's counsel acknowledges, in his brief, that the decision of this cause rests almost entirely upon the question of the admissibility of the parol evidence. He has, however, relied in some degree upon the act of sale itself. Before considering the question of the admissibility of the parol evidence, we propose to examine the case as standing simply upon the act of sale, the written contract of the parties.

The material contents of the act are as follows: *Boner* declares that, for the consideration of $250, cash, and the vendee's note, of even date with the act,

for $7220, payable to the vendor's order, with interest, on the 1st February ensuing, and duly paraphed, he sells to *Mahle* seven slaves (being those in controversy). And, in order to secure the payment of the said note, as well as all interest that may become due thereon, the said *John H. Mahle* hereby mortgages and especially hypothecates all that lot of ground situated in the parish of Natchitoches, etc.; also, the undivided half of another lot of ground, etc., (describing them) all of which property is so to remain mortgaged until complete payment of said sum and interest." Nothing is said about mortgaging the slaves, and the act is also entirely silent as to the vendor's privilege.

Is a renunciation of the vendor's privilege to be inferred from the face of the act, upon a sound interpretation of the language which the parties in this solemn written form, have used to express their intentions?

By article 3216 of our Code, the vendor has a privilege on the estate, or slave, sold by him, for the payment of the price, or so much of it as is due, whether it was sold on, or without, a credit. It is not necessary that, in the contract of the parties, this privilege should be expressly stipulated. It is a right which springs from the nature of the debt, and by force of law is embodied in the contract, unless it be renounced. It is also a right of a very high character, conferring advantages superior to those which flow from a mortgage. It is not necessary that this right should be renounced in express terms, in the act of sale. Such renunciation may be implied from the terms of the instrument. But, inasmuch as the obligation of contracts extend not only to what is expressly stipulated, but also to everything that by law is considered as appertaining to the nature of the particular contract (Code 1897); and, inasmuch as the vendor's privilege is a legal concomitant of the contract of sale, it must be held, upon sound principles of interpretation, that the renunciation of this important right which sets aside the legal presumption, should be established, not by doubtful, but by clear and cogent inferences from the language of the parties. Now the omission of the parties to stipulate a special mortgage, cannot be considered as an implied renunciation of the higher right of privilege. Such a construction would militate against the express provisions of our law, which declare privileges to be given by the nature of the debt, and confer a privilege upon the vendor by force of the contract of sale itself. It has even been held that, when a special mortgage had been taken, its subsequent release did not affect the vendor's privilege. *Citizen's Bank* v. *Cuny*, 12 Rob. 279. See also *Succession of Johnson*, 3 Rob. 217. *Howard* v. *Thomas*, 3 La. 112. Privilege and mortgage may co-exist, and the former may exist without the latter. The rights are different.

But it is said that the renunciation of the privilege may be inferred from the omission to grant a mortgage upon the slaves, coupled with the fact of granting a mortgage upon other and independent property. In our opinion this is not a necessary inference. Because a vendor takes the security of other property, we are not to presume that he relinquishes the security which the law gives him upon the property sold; but rather to consider him as superinducing an additional security; and more particularly, where the property sold is in its nature perishable, liable to be impaired by disease, or destroyed by death. We cannot look upon it in the opposite light, without assuming that the parties were ignorant of the law, and disregarded the legal consequence which it attaches to the contract they were making. An interpretation of contracts based upon presumed ignorance of the law by the contracting parties, is inadmissible.

Some stress was laid by the counsel upon the words of the act—"and, in order to secure the payment of said note." From these expressions it was argued

that the parties are to be considered as saying, " the lands shall be the security and nothing else shall be encumbered." This conflicts with the rules of interpretation we have already noticed, and, if sanctioned, would destroy the vendor's privilege in every act of sale on credit that has come under our observation, when a special mortgage was granted on the property sold. For the usual formula is : " Now in order to secure the payment of the said notes, the vendee mortgages, etc."

In conclusion, we may add, that although the doctrine that a renunciation of a mortgage or privilege may be implied, is fully sanctioned by authority, the illustrations found in the books, are cases where the implication is cogent, and its rejection would be against good conscience. Thus, in the roman law, the wife was considered as making a tacit renunciation of her mortgage, by uniting with her husband in a contract of sale, *avec promesse d'eviction*. So in the same law, a wife who appears with her husband in a contract, by which he constitutes a dowry for his child on a property subject to her legal mortgage, was considered as releasing her mortgage on that property. So of a mortgage creditor consenting that the property encumbered in his favor should be mortgaged to another creditor. So of the lien of a factor under the law merchant: It is founded upon a tacit agreement of the parties, which the law implies, but will consider as waived if, while the property is in the hands of the factor with a lien attached to it, he agrees to hold the property exclusively for, or as the property of, a third person.

Merlin expresses, with his usual accuracy, the just rule for the interpretation of renunciations. Les renonciations se font de deux manières ; expressément, et par des faits. Mais pour que des faits emportent renonciation, il faut qu'il en résulte une volonté manifeste de renoncer, c'est-à-dire, que ces faits soient directement et à tous égards contraires au droit ou au privilége dont il s'agit. Merlin, Rep. *verbo* Renon. § 3. See also Persil, Questions sur les Hyp. p. 38. *Wall* v. *Bry*, 1 An. 314.

Being, therefore, of opinion that, on the face of this instrument, which the parties have chosen to make in the most solemn form known to our law, the repository and evidence of their intentions, the vendor's privilege was not waived, we proceed to the consideration of the question whether the parol evidence is admissible to contradict the act, and show that the parties did intend that it should not exist.

It appears, by the bill of exceptions " that, on the trial of this cause the defendant offered in evidence the testimony of *C. E. Greneaux*, (which evidence is made part of the bill of exceptions,) for the purpose of rebutting the presumption arising from the deed of sale of *Boner* to defendant, that the said *Boner* had a vendor's lien on the negroes therein sold ; and also for the purpose of explaining the ambiguity latent in said deed, that plaintiff took the mortgage on the Natchitoches property as sole and substantive security for his debt, and not as further and additional security ; but the court refused to admit the said testimony on the ground that it is not legal to defeat by parol the authentic act containing a privilege ; that the parties must stand by the written act; and that any other rule would unsettle the rights of property, and leave the defendant upon the uncertain memory of man."

The testimony of Judge *Greneaux* was as follows: *Interrogatory* 1. Be pleased to refer to the act of sale passed before you in your capacity of notary public, on or about the 19th May, 1838, from *William Boner* to *John H. Mahle,*

of certain slaves, and state whether or not you remember what took place between the parties when said sale was made?

*Answer.* I refer to the act of sale passed before me in my capacity of notary public on the 19th of May, 1838, from *William Boner* to *John H. Mahle*, of certain slaves, and believe I have some recollection of what took place between the parties when said sale was made.

*Interrogatory 2.* State why it was that *Boner* did not retain a special mortgage on the property then sold?

*Answer.* *Boner* did not retain a special mortgage on the property then sold, because *Mahle* stated that he wished to have the slaves free of hypothecation, in order to enable him to mortgage them with his plantation to some bank.

*Interrogatory 3.* Did, or did not, the said *Boner* accept the special mortgage on town property in Natchitoches, as full security for the price of the slaves sold?

*Answer.* I then understood, from the purport of the act of sale, that *Boner* was satisfied with the mortgage on the house, as full security for the payment of the price of the slaves sold?

*Interrogatory 4.* What reason did *Mahle* assign for not giving *Boner* a special mortgage on the slaves? Did he, or not, tell *Boner* that he wanted to obtain a loan by mortgaging said slaves in bank?

*Answer.* I have answered this in my answer to the second interrogatory.

*Interrogatory 5.* What was, at that time, the value of the town property mortgaged by *Mahle?* Was it or not, according to the value of town property at that time, sufficient to secure the amount of the purchase?

*Answer.* I cannot say.

*Interrogatory 6.* Was it, or not, at the time of the sale, and afterwards, understood between *Boner* and *Mahle*, that *Boner* was to have no mortgage, privilege, or lien on the slaves sold; and was not the mortgage on town property given in consideration of *Boner's* relinquishment of his lien on the slaves?

*Answer.* I have stated my impressions at the time, in my answer to the third interrogatory.

*Interrogatory 7.* Is it, or not, the almost universal custom when real estate or slaves are sold on credit, to retain a special mortgage for the price, in addition to the vendor's privilege? Why was the custom departed from in this instance?

*Answer.* It is generally the custom, when real estate or slaves are sold on a credit, to retain a special mortgage for the price, in addition to the vendor's privilege. I recollect having asked the parties in this case, and specially *Mahle*, why he preferred giving a mortgage on his house and lot, and his answer was as I have already stated. *Mr. Boner* was present, and did not object. There was no express understanding that *Boner* should relinquish his privilege; but the object of his taking a mortgage on the house and lot, instead of retaining it on the slaves, was to enable *Mahle* to mortgage them free from all encumbrances or liens. This is what I understood from both of them, at the time the sale was made and passed before me.

It must be observed that the answer did not charge, nor was the testimony offered to prove, fraud. The language of the answer is, that it was well understood and agreed between the vendor and vendee that no lien or privilege of any kind should be retained, that the Natchitoches property should be mortgaged in lieu thereof to secure the payment of the note, and that if an express relin-

quishment of the vendor's lien was not therein made, it arose purely from the remissness, negligence, or perhaps ignorance of the notary. It is true the answer adds: "Your respondents do now further distinctly charge upon plaintiff *fraud, in attempting to enforce a lien* which he well knows he did relinquish, for and in consideration of the mortgage hereinbefore referred to". But this allegation of fraud points not to the formation of the contract or the execution of the act of sale, but to the subsequent conduct of the plaintiff.

The law requires that every transfer of immovable property or slaves must be in writing, saving, however, under certain circumstances, the confession of the vendor, when interrogated on oath. Following this provision, and under the title of "testimonial proof," is the stringent rule: "Neither shall parol evidence be admitted against, or beyond, what is contained in the acts, nor on what may have been said before, or at the time of, making them, or since". Articles 1842 and 2267 authorize an exception, where an act is attacked on account of "fraud or deceit".

It is obvious that the attempt here is, to contradict the authentic written evidence of the parties, to give parol evidence *against* the act. The written contract, by its legal effect, confers the vendor's privilege; by the testimony, the plaintiff seeks to show that the parties intended that no such privilege should exist—to substitute another contract for that which they have in a solemn writing expressed—to establish that they meant one thing, but signed another. Let it be observed that the act is not in itself unintelligible. What is written in the act is unambiguous, and the legal effect of what is written is also clear.

This testimony then, we think, could not have been admitted under the pleadings, and for the purpose for which it was offered, without violating the letter and the meaning of the Code. It was properly said at bar that, on this question we must follow our own law. In the equity jurisprudence of England, to which we have been referred, there seems to be a good deal of latitude allowed in the admission of parol evidence to vary or reform written contracts upon the ground of mistake. Although it must be, at the same time, observed that, courts of Equity will grant such relief only where there is a plain mistake, clearly made out by satisfactory proofs, and refuse it where the evidence is loose, equivocal, or contradictory, or is in its texture open to doubt or to opposing presumptions. See Story's Equity Jurisprudence, § 155. The opponents of that doctrine contend that, there is great danger in setting aside the solemn engagements of parties when reduced to writing, by the introduction of parol evidence, and that it leaves too much to the discretion of the bench, and holds out temptation to perjury; while its advocates insist that, it is in furtherance of justice, and that it would be a great defect in the moral jurisdiction of courts of Equity if they were to refuse in such cases to administer relief upon parol evidence. It is not our province to enquire what our own law ought to be, but what it is. It forbids us to let in contemporaneous parol evidence to defeat the written contract, and prefers that cases of individual hardship should sometimes occur, rather than that the daily transactions of the people and their titles to immovable property, should be exposed to the uncertainty which would result from permitting written contracts to be questioned upon oral testimony.

In conclusion we may remark that, the present case is not an inapt illustration of the danger that would result from a contrary rule. The witness does not profess to speak with certainty: "I believe I have some recollection of what took place between the parties when the sale was made". "I then understood from the purport of the act of sale, that *Boner* was satisfied with the mortgage on the house &c". "I have stated my impression at the time".

It has been contended that *Mahle*, and his heirs now holding under him, are to be considered as third persons, and holding the place and rights of *Elgee*. The facts relied upon in support of the position that *Mahle* became a third person, are as follows : In 1838,*Boner* sold the slaves to *Mahle* by the authentic act already considered, which act was duly recorded,and preserved the vendor's privilege. After this, *Mahle* mortgaged the property to *Barrett*, the parish judge certifying that the slaves were unencumbered by mortgage. *Elgee* subsequently became part owner of the *Barrett* mortgage, caused the slaves to be seized and sold under it, and bought them at judicial sale. In March, 1843, *Mahle* was discharged as a bankrupt by the United States Court, under proceedings instituted' in 1843. In November, 1843, *Elgee* sold the slaves to *Mahle*, with exclusion of warranty, except against his own acts. Under these circumstances it may be questionable, whether *Mahle* can be treated as a third person. He was a party to the original contract, now to be enforced ; the price he promised to pay, he has not paid; and, although legally discharged from personal liability by the decree of the bankrupt court, the liability exists in *foro conscientæ*.

But, even if *Mahle* and his heirs could, under the circumstances, be deemed third persons, the vendor's privilege was preserved against them by the due recording of the act of sale (C. C. 3238) ; and, for the purposes for which it was offered, the parol evidence would have been as inadmissible against *Boner* as though the title had never passed from *Mahle*. What safety would there be in contracts, and what security for the rights of property, if, when A. and B. have made an agreement in a solemn written form, C., a subseqsent creditor of B., should be permitted, without a charge of fraud, to attack the rights of A., by proving that B. undertook one thing in the agreement, but meant another. The principles and policy of the law upon which we have already commented, forbid such evidence.

But it is said that the children of the female slaves, born since the sale, are not subject to the vendor's privilege; and that the judgment which, by relation to the pleadings, recognizes a privilege upon such increase, is therefore erroneous. In the consideration of this question it may be well to enquire whether, if the vendor has chosen to sue for the resolution of this sale by reason of the nonpayment of the price, he would have been entitled to take this increase.

Upon this point we are not aware that the Code contains any express enunciation. We must draw our conclusions from the anology of cases where it has plainly spoken, and from authority. The child follows the condition of the mother, and, if she be a slave, the child-born becomes the property of her owner. This relation, established by the Code (art. 183), construed in a restricted sense, might be said merely to solve the question of the child's condition; but, taken in connection with other provisions of the Code and of our statute book, it corroborates the view that, the child should be deemed annexed to the parent, and that the property in the former should follow as an accessory the property in the latter. It is in this sense that the law speaks in treating of the rights of an usufructuary. Slaves are spoken of as natural fruits, in article 557 of the Civil Code. In article 491 it is said that, the children of slaves belong to the proprietor, by right of accession. In both articles they are spoken of concurrently with fruits of the earth, spontaneous or cultivated. But while the latter, produced during the existence of the usufruct, are declared to be-

long to the usufructuary, the children of slaves are excepted. In article 539 it is said, the children of slaves subject to usufruct, who are born during its duration, belong to the owner. The usufructuary has only the enjoyment of their labor and services.

Acting upon the analogy of this article of the Code (536), the court held, in *Patterson v. Bonner*, 19 La. 509, that the vendee under a *vente a reméré* was not the owner of slaves born of the slaves purchased, during his possession under the contract, and that the vendor, when he exercises the right of redemption, is entitled to recover them as owner.

If, in such a sale, the increase would not be considered the property of the vendee, it appears to us they should not, when the vendor sets aside the sale, by availing himself of the resolutory condition. In the *vente a reméré*—the sale with the right of redemption—the resolution of the sale does not spring from the fault of the purchaser, but is based upon the exercise of the potestative condition reserved to the seller, and of which, under the agreement of the parties, he choses, for the furtherance of his own interest, arbitraily to avail himself. But, in the other case, the right to exercise the resolutory condition has its source in the fault of the purchaser, who has violated, or failed to perform, his promise to pay the price. *Quia nihil penes eum residere oporteret ex re in qua fidem fefellisset.*

The view we have taken of this question derives additional force from the language of our statutes concerning slaves, which are conceived in the same humane spirit which restricts the master's power to punish the slave. " Every person is expressly prohibited from selling separately from their mothers, the children who shall not have attained the full age of ten years." So, too, from the fiction of the law : " Slaves shall always be reputed and considered real estate ; shall be, as such, subject to be mortgaged, according the rules prescribed by law ; and they shall be seized and sold as real estate." Statute of 1806. It is proper to observe that the children, in this case, do not appear to have reached the age of ten years. The sale from *Boner*, and the mortgage to *Barrett*, do not speak of the slaves *Charity*, *Susan*, and *Elvira*, as then having issue. The only child, whose age is exhibited by the record is a child of *Elvira*, not at the present time nine years old. The two children, issue of *Susan*, are not mentioned in any of the sales or the mortgages down to 1843 ; and she was fifteen years old at the date of *Boner's* sale, in 1838. In the absence of contrary proof, we must presume them to be under the age of ten years. If the issue are to be treated as fruits, still, as the law forbids them to be separated from the mother until the age of ten years, we cannot liken them to gathered fruits until they have attained that age.

The conclusion, we think, is clear that, if *Boner* had chosen to sue for a resolution of the sale, he would have had a right to take back the offspring. They would not have become the property of the purchaser. This goes very far to establish the right of privilege. It is indeed difficult, on principle, to distinguish the cases. We have not been favored with any argument which would authorize us to make a distinction, and to say that if the vendor chooses to resolve the sale, he shall take the increase ; but that if he seeks to collect the price, the increase shall be considered as disconnected from the parents, and unreservedly, and without encumbrance, the property of the purchaser.

The privilege of the vendor is a species of implied mortgage, superior, however, in some respects, in its rank and effect to the conventional mortgage. The

*effects* of mortgages and privileges are treated of in the same chapter of the Code (Mortgages, chap. 3, sec. 1, *et seq.)* and we are not aware of any reason for excluding the vendor, whose rights are deemed peculiarly sacred, from the advantages enjoyed by the simple mortgagee. "La raison," says Duranton, in speaking of the vendor's privilege and of the effect of the mortgage, "est la même pour le privilége." Vol. 10, §158.

Our law, in this respect, follows the ancient jurisprudence. "Quæ rebus obligatis accesserunt obligata censentur, veluti si quid fundi oppignorato per alluvionem adjectum sit, aut proprietati, quæ pignori data erat, ususfructus posteâ accreverit." Voet, cited in Troplong, Hyp. vol. 2, no. 551. In the language of the commentator it is *assise sur la chose,* and extends itself with the property and its "*modifications.*"

In the roman law, we find this question considered with reference to slaves. Quæ ex re pignorata apud eum qui eam obligavit nascuntur, hujus rei pignori accedunt. Partus pigneratæ ancillæ in pari causa, esse qua mater est, olim placuit. Si mancipia in causam pignoris ceciderunt, ea quoque quæ ex his nata sunt, codem jure habenda sunt.

Although the mortgage be restrained to certain things, yet it will nevertheless extend to all that shall arise or proceed from the thing which is mortgaged, or that shall augment it, and make part of it. Thus, the fruits which grow on the lands that are mortgaged, are subject to the mortgage, while they continue *unseparated from the ground.* Thus, where a stock of horses, a head of cattle, or a flock of sheep, is put in pawn into the creditor's hands, the foals, the lambs, and other beasts which they bring forth, and which augment their number, are likewise engaged for the creditor's security; and if the whole herd, or flock, be entirely changed, the heads which have renewed it are engaged in the same manner as the old stock. Thus, when the bounds of a piece of ground that is mortgaged happen to be enlarged by that which the course of a river may add to it, the mortgage extends to that which has augmented the ground. Thus a house that is built on ground which is mortgaged, is subject likewise to the mortgage. And if, on the contrary, a house be mortgaged, and it perishes by fire or falls through decay, the mortgage will subsist on the ground where the house stood. Thus when a debtor mortgages a piece of ground of which he had only the bare property, another enjoying the usufruct of it, when the said right to the usufruct comes to be extinct, the mortgage will comprehend the ground together with the fruits. Domat, book 3, tit. 1, sec. 1, § 7. (Strahan's ed.) See Civil Code, 3278, 3371, &c.

We are, therefore, of opinion that, the vendor's privilege attached on the issue of the slaves, born after the defendant purchased.

We have already expressed a doubt as to the right of *Mahle* and his heirs, to be considered as third persons by reason of the sale to *Elges* and the resale to *Mahle* after his bankruptcy. But, however this may be, the act of sale was duly recorded; and we do not perceive how a third possessor could resist the privilege, any more than he could resist an action based upon the resolutory condition. Resoluto jure dantis, resolvitur jus accipientis. Persil, Ques. sur les Hyp. p. 27. Trop. Vente, § 629.

It is, therefore, decreed that, the judgment of the court below be affirmed, with costs; said judgment being considered by this court as comprehending, under the expression slaves mentioned in the petition, not only the slaves *Jasper, Isaac, John, Jim, Charity, Susan* and *Elvira,* but also any increase born of any or either of said slaves since the 19th day of May, 1838.