# GROVES v. SENTELL.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 278. Argued and submitted March 13, 1894. — Decided May 14, 1894.

*The Stephen Morgan,* 94 U. S. 599, affirmed to the point that a party who does not appeal from the final decree of a Circuit Court cannot be heard in opposition thereto, when the case is properly brought here by the appeal of the adverse party.

A note by which three parties, signing it, promise to pay to the order of the payee at a bank in New Orleans the sum named therein with interest, not negotiable, is a joint obligation under the law of Louisiana, and binds the several parties thereto only for their proportion of the debt; since, to make it a solidary obligation, binding each of the promisors for the whole debt, the solidarity must, under the law of that State, be expressly stipulated, and is never presumed.

The promisors on that note, in order to secure it, mortgaged real estate in Louisiana, which they then held in common, undivided. They thereby severally declared that they were indebted to the mortgagee, etc., and that they did thereby mortgage to the mortgagee the property described in the deed. There was no stipulation showing an intention to mortgage separately an undivided part of the property for an undivided part of the debt. *Held,* that it was the intention of the parties that the security for the purchase money should rest upon the entire entity.

A mortgagor has the power, under the laws of Louisiana, to exclude indivisibility in contracting the mortgage, and, if he fails to do so, indivisibility applies, not alone as a result of his silence, but also because, being the general rule and of the nature of the contract, it exists unless excluded by its express terms or by a plain implication deducible from it.

The divisibility of a debt secured by a mortgage does not necessarily import the divisibility of the mortgage securing it.

The voluntary partition by the mortgagees of the property covered by the mortgage did not operate to prevent the mortgage creditor from enforcing his security against either part.

A subsequent mortgage creditor, who became such after the division of the property, and only as to one undivided part, is entitled to be subrogated to the rights of the first mortgage creditor, as they existed at the time of the subrogation.

If a party interested in the result of the suit, claiming under the subsequent mortgage, files a bill in the nature of a bill of interpleader, he cannot be allowed a solicitor's fee, to be paid from the fund dedicated to the payment of the mortgage.

FANNY B. Lambeth and Dora Lambeth, as heirs to their deceased father, were the owners, in equal undivided proportions, of certain parcels of real estate situated in the parish of Avoyelles in Louisiana. Two of these parcels were known, respectively, as the "Leinster Plantation" and the "Lucky Hit Plantation." Fanny B. Lambeth was married in April, 1865, to Christopher M. Randolph. The Leinster plantation was leased during 1865, '66, and '67 to John Rhea, who died in October, 1867, pending the lease.

On the 15th day of January, 1868, Fanny B. Lambeth, wife of Christopher M. Randolph, (whom we shall hereafter refer to as Mrs. Randolph,) and Miss Dora Lambeth appeared before Generes, a notary in the parish of Avoyelles, and acknowledged themselves indebted to Mrs. Rosetta Rhea, widow of John Rhea, of Madison County, Indiana, in the sum of $8970.12, which they declared was a balance due by them for the purchase price of certain movable property — mules, cane, implements, etc. — which belonged to Rhea at the time of his death, and which had been placed on the Leinster plantation by him, for use in its cultivation. The act declared that the movable property which they bought belonged to Mrs. Rhea, who was the widow of John Rhea, and as such was, under the laws of Indiana, where Rhea was domiciled, his sole heir, as he died intestate and left no ascendants or descendants. To evidence the indebtedness, Mrs. Randolph, authorized by her husband, and Miss Lambeth drew their joint note, as follows:

"AVOYELLES, LA.,

"$8970.12. "LEINSTER PLANTATION, *January* 1*st*, 1868.

"Two years after date we promise to pay to the order of Mistress Rosetta Rhea, at the Citizens' Bank of Louisiana, in the city of New Orleans, eight thousand nine hundred and seventy and $\frac{12}{100}$ dollars, for value received, with interest at the rate of eight per cent per annum from date until paid. Not negotiable.

"FANNY B. RANDOLPH.
"C. M. RANDOLPH.
"DORA LAMBETH."

Mrs. Rhea bound herself to obtain a judicial recognition from the courts of Indiana of her right of inheritance to her husband's estate before enforcing payment of the note.

To secure this note, Mrs. Randolph and Miss Lambeth, by the same act, mortgaged, 1st, the Leinster plantation; 2d, a tract of land adjoining the Leinster plantation, known as the "Faulkland tract." This act of mortgage was duly inscribed.

In September, 1868, Christopher M. Randolph, the husband of Fanny B. Lambeth, died. In December, 1868, Dora Lambeth married T. O. Stark. We refer to her hereafter as Mrs. Stark.

In December, 1868, "In the matter of the estate of John Rhea, deceased, in the Court of Common Pleas of Jefferson County, Indiana," Rosetta Rhea was recognized as his sole heir, and as such was decreed to be entitled to the promissory note set forth above, and all the rights securing the same.

On the 9th of January, 1873, Mrs. Randolph and Mrs. Stark made between them, by voluntary and private agreement, a partial partition of their father's estate. Mrs. Randolph took a portion of the Leinster plantation and other lands, and Mrs. Stark took the remaining portion of that plantation, also with other lands. Thus, by the terms of the partition, a portion of the land which had been mortgaged to secure the debt due to Mrs. Rhea was allotted to Mrs. Randolph and a portion to Mrs. Stark. Nothing was said in the partition as to the then existing mortgage in favor of Mrs. Rhea.

On the 23d of April, 1873, Mrs. Randolph and Mrs. Stark constituted T. O. Stark their "true and lawful attorney in fact, for us and in our names, to settle and establish the payments made and amounts still due by them on a mortgage note of eight thousand nine hundred and seventy $\frac{12}{100}$ dollars, ($8970.12), dated January 1, 1868, held by Mrs. Rosetta Rhea; to endorse on said note the amount paid thereon; to interrupt prescription; to consent to any subrogation in favor of any person or persons or commercial firm who may pay a portion of their said indebtedness on said note, and thus divide their said indebtedness, and to appear and sign, in *their* name, any

agreement, document, or notarial act carrying out said subrogation, with any clauses or conditions which said attorney may, in his discretion, deem fit; to enter into said arrangements with said Mrs. Rhea, her agents or attorneys, to obtain an extension of time for the payment of the balance due on said promissory note, said extension of time to be granted and accepted upon such terms and conditions as to our said attorney may seem fit; to sign a notarial act for that purpose and to acknowledge therein, in *their* name, that they recognize said Mrs. Rosetta Rhea as the rightful owner of said note, in her quality of sole heir of her deceased husband, the late John Rhea, of Madison County, Indiana, recognized as such by the court of Jefferson County, Indiana, in the matter of the estate of John Rhea, deceased, and alone entitled to claim payment of said note, with full power of substitution, and generally to do everything necessary to carry out the premises as fully as if done by us in person, hereby ratifying all and whatsoever our said attorney may lawfully do or cause to be done by virtue hereof."

On the 28th day of April, 1873, by act before Trist, a notary public in New Orleans, Stark, as agent of Mrs. Randolph and of his wife, and Victor Olivier, Esq., as agent of Mrs. Rhea, declared that the note which had been given Mrs. Rhea, and secured by the mortgage as aforesaid, had been reduced by partial payments, all arrears in interest having been paid, to the sum of $7577.34, and the time for the payment of this balance was extended by Olivier, as agent for Mrs. Rhea, to the 1st day of March, 1874, interest thereon to be paid at the rate of eight per cent from the 28th day of April, 1873. Both Stark and Olivier, on behalf of their respective principals, declared that "after a careful computation of interest and deduction of partial payments made at different times to Mrs. Rosetta Rhea by the drawers of said note," the aforesaid sum was due.

In May, 1875, Mrs. Randolph acknowledged herself indebted to Johnson & Goodrich, a commercial firm of the city of New Orleans, in the sum of $8000, evidencing her debt by her notes, secured by a mortgage of the portion of the Leinster plantation which had been allotted to her in the partition, and also

of her interest in an undivided tract of land which she had inherited from her father's estate, and which had not been included in the partition. In June, 1875, Johnson & Goodrich transferred this note to G. W. Sentell & Co., in liquidation.

In October, 1883, G. W. Sentell and W. B. McLean as executor of B. Conyers, a deceased partner of the former firm of G. W. Sentell & Co., both representing the interest of the firm in liquidation, sued in the District Court of the parish of Avoyelles to foreclose the mortgage which the firm in liquidation had, as stated, acquired by subrogation from Johnson & Goodrich. On the 24th of December, 1883, judgment was rendered in favor of Sentell & Co. in liquidation and against Mrs. Randolph, accompanied by a decree for a sale of the mortgaged property. Under this decree, on the 1st of March, 1884, the sheriff of the parish of Avoyelles sold the portion of the Leinster plantation which had been allotted to Mrs. Randolph, and the undivided interest in the tract of land, both of which had been included in her mortgage to Johnson & Goodrich. The property had been adjudicated to G. W. Sentell for $12,002. The mortgage in favor of Mrs. Rhea, being on record and ranking the Johnson & Goodrich mortgage, Sentell, the purchaser, retained in his hands from the amount of his bid, to pay the same —

| | |
|---|---|
| For principal | $4873 00 |
| For interest up to date of sale | 1164 12 |
| Total | $6037 12 |

The sum thus retained by Sentell to pay the principal of the note was the actual amount due. At the time of the sale the principal had been reduced from $7577.34, as stated in the notarial act of 1873, to $4873, as mentioned in a writing on the reverse of the note. The payments which brought about this reduction were numerous, and made at brief intervals. Some of them were evidenced by notarial acknowledgments between Stark and Olivier, agents; some merely by endorse-

ments upon the back of the note. Some had been made by Sentell, who took subrogations; these last, however, being made subordinate in rank of mortgage to the amounts due on the original note.

All of these payments were made on the entire note, without any indication that they were imputed particularly to any portion of the debt due by either of the parties. Hence, all the payments were credited at the times they were made on the entire debt. The last credit on the principal of the note is as follows:

"The principal of the within note has been reduced by payment on the same to $4873.00, with interest thereon to March 5, 1881, to which date the payment of said sum has been postponed.

"New Orleans, April 28, 1880. VICTOR OLIVIER, JR.,
"Agent for Mrs. Rosetta Rhea.
"T. O. STARK,
"Agent for Mrs. Randolph and Mrs. Stark."

There are two additional credits of payments of interest, the first up to March, 1882, and the second up to March 5, 1884, one of these interest credits being accompanied by a repetition of the statement that the principal of the note was at the time $4873.00.

In April, 1886, Martha Groves, of Indiana, and William J. Groves, of Ohio, sister and brother of Mrs. Rosetta Rhea, were duly recognized by the Circuit Court of Jefferson County, Indiana, as her sole heirs and distributees, and, as such, entitled to all the rights of Rosetta Rhea in and to the note to which we have referred.

In April, 1886, Martha Groves, and William J. Groves, and Pogue, administrator of Rhea, sued in the United States Circuit Court G. W. Sentell for $4873, with interest thereon at eight per cent from March 5, 1884, until paid. The object of this suit was to compel Sentell to pay the balance thus stated to be due on the note out of the sum which he had retained. Sentell thereupon filed in the Circuit Court of the

United States a bill of interpleader, in which he averred the
fact of his purchase, and his retaining the amount in his hands,
and that there were conflicting claims to the fund. He
alleged, 1st, that he had been notified by Mrs. Randolph not
to pay over the amount apparently remaining due on the note,
as the same was not due; 2d, that he had also been notified
by W. B. McLean, as liquidator of G. W. Sentell & Co., and
also as executor of B. Conyers, a deceased member of the firm
of G. W. Sentell & Co., that such firm in liquidation was
entitled to the fund retained. He averred that he had always
been ready and willing to pay over the fund, and prayed that
the defendants might be decreed to interplead and adjust
between themselves their rights and interests in the money
due and payable under the mortgage. He made defendants
to the bill Mrs. Martha Groves, William J. Groves, Fanny B.
Randolph, and William B. McLean, as liquidator of the firm
of G. W. Sentell & Co., and as testamentary executor of B.
Conyers. Upon this bill an injunction was issued, restraining
Martha Groves and William J. Groves from prosecuting their
suit. Sentell deposited in the registry of the court $5743.46,
to abide the result of the litigation. Mrs. Randolph answered
and charged the nullity of the note on the ground, (1st,) that
it had been given for a debt of her husband, for which she
was incompetent to bind herself; and, (2d,) that the note, if it
was originally binding, which she denied, represented nothing
due by her, since it had been extinguished, so far as she was
concerned, by payment. She charged that this extinction
would result from the proper credit to her of the amounts
which had been paid; and that many payments had been
erroneously credited to the note generally which should have
been imputed to her portion of the debt. McLean, liquidator
and executor, practically joined in the claim set up by Mrs.
Randolph. He charged the nullity of the note because it was
given by Mrs. Randolph for a debt of her husband. He
further alleged that, as the second mortgage creditor on the
property sold, the firm of G. W. Sentell & Co. in liquidation
was entitled to the entire balance of the fund, to be applied
to the payment of their junior mortgage. He, in addition,

averred that, if any portion of the note was payable out of
the proceeds of the property allotted in the partition to Mrs.
Randolph, the holders of the note could not exercise their
right against such proceeds, without previously exhausting
their remedy against that portion of the mortgaged property
which had been allotted to Mrs. Stark; that, as junior mort-
gage creditor on the portion of the property allotted to Mrs.
Randolph, he had a right to compel the creditor to exhaust
Mrs. Stark's property, before proceeding against the proceeds
of Mrs. Randolph's property ; and, finally, that the holder of
the note was not entitled to be paid the amount due on Mrs.
Randolph's half of the debt from the proceeds of her property,
unless the holder gave to the second mortgage creditor a sub-
rogation to the rights of the holder against Mrs. Stark's share
of the property — which subrogation, he averred, the note
holder was unable to give because the proportion of the debt
due by Mrs. Stark had become prescribed.   During the course
of the proceedings below, Mrs. Stark was, by order of the
court, made a party defendant to the bill.   She demurred, on
the ground that she was not a necessary party to the cause.

On these issues the case was tried.   The court below held
that Mrs. Randolph, having frequently ratified the debt after
the death of her husband, was estopped from claiming that
she was not bound therefor, and hence rejected the claim of
Mrs. Randolph and Sentell & Co. in liquidation as to the
nullity of the note.   After reference to a master, to examine
and report as to the payments, it appeared that the full
amount of the payments had been applied and that the appli-
cation of them all did not reduce the amount due on the note
below the sum of $4873, with interest from March 5, 1884, as
stated in the last credit on the note.   The court, however,
concluded that, as many of the payments had been in fact
made from Mrs. Randolph's individual funds, they should
have been imputed to her share of the obligation, instead of
to the debt as a whole.   It held that the correction of the
imputations of payments in accordance with this finding re-
duced the sum remaining due by Mrs. Randolph, on her share
of the note, to $601, and this amount is decreed to be paid

from the proceeds deposited by Sentell. Deducting this $601 from the total amount due on the note — $4873 — left $4273 due by Mrs. Stark, as her portion of the original obligation. Treating this sum due by Mrs. Stark as not secured by mortgage on that portion of the property which had been allotted to Mrs. Randolph by the partition, the court decreed the payment of the entire remaining proceeds to Sentell & Co. in liquidation, as the junior mortgage creditor. It allowed to the solicitor of the complainant a fee of $250, to be paid from the fund deposited. It dismissed the bill as to Mrs. Stark on the ground that, as she had been made a party solely for the purpose of charging her with notice of the accounting and distribution, and this purpose had been subserved by her appearance, her demurrer must be sustained.

From the decree of the lower court Martha Groves, William J. Groves, and Pogue, administrator of Rosetta Rhea, appealed, citing on the appeal G. W. Sentell, Mrs. Fanny B. Randolph, Mrs. Dora Stark, and W. B. McLean, executor of Benjamin Conyers, deceased, and liquidator of the firm of G. W. Sentell & Co.

*Mr. George A. King,* (with whom were *Mr. Charles W. Hornor* and *Mr. William. S. Benedict* on the brief,) for appellants.

*Mr. E. T. Merrick, Senr.,* for Mrs. Randolph, appellee, submitted on his brief.

*Mr. E. M. Hudson,* for Sentell, complainant in the bill of interpleader and appellee, submitted on his brief.

*Mr. Edgar H. Farrar, Mr. Benjamin F. Jonas,* and *Mr. Ernest B. Kruttschnitt,* for McLean, liquidator and appellee, submitted on their brief in which they contended :

I. There was nothing in the circumstances under which the note of January 1, 1868, to Mrs. Rhea was given, to create anything but a joint liability. The note on its face, by the principles of commercial law as applied in Louisiana, is not a

joint and several note but a joint one. *Mayor of New Orleans* v. *Ripley*, 5 La. 120; *S. C.* 25 Am. Dec. 175. The terms of the mortgage given to secure this note do not extend the obligation from a joint to a joint and several one. A mortgage being a mere accessory to the debt, each person mortgaged his interest in the plantation to cover his liability, and no more. There is nothing in the mortgage, or in the circumstances under which it was given, from which any suretyship for each other could be presumed, and nothing by which Mrs. Randolph bound herself or her property for Mrs. Stark's share of the debt, or Mrs. Stark bound herself and her property for Mrs. Randolph's share of the debt. Therefore, the mortgage given by Mrs. Randolph, though stipulated in the same act as the mortgage given by Mrs. Stark, bears, only so far as her share of the indebtedness is concerned, upon her share of the property.

On this point the cases of *Walton & Kemp* v. *Lizardi*, 15 La. 588, and *Erwin* v. *Greene*, 5 Rob. (La.) 70, are absolutely conclusive.

II. By the effect of the partition made between Mrs. Randolph and Mrs. Stark, of the plantation, to secure the Rhea note, Mrs. Randolph's mortgage was confined to her half of the property, and Mrs. Stark's note was confined to her half of the property, and all payments made by Mrs. Randolph upon the note reduced, *pro tanto*, her liability thereon.

The master, in his report, has given in detail the payments made by Mrs. Randolph on this note, showing that there remained, at the date when the bill of interpleader was filed and the fund was deposited in court, the sum of six hundred and two $\frac{14}{100}$ dollars, and for this sum the court below entered a decree in favor of the appellants. There was not any attempt made in the court below to attack the computation of the master, and none can successfully be made, as every item of payment, stated in his report, is confirmed by the evidence, and the evidence on that subject is not in any manner conflicting.

III. The claim of the appellant that G. W. Sentell, who filed the bill of interpleader, had assumed the plaintiff's debt

to the extent of the amount retained in his hand, is utterly without any foundation in law, or in fact. He was obliged to pay the amount which he retained in his hand to whoever was entitled. Article No. 207 of the Code of Practice required him, as the purchaser at a public sale, to retain in his hands the price bid by him at the sale to recover all liens, privileges, and mortgages upon the property which were prior in rank of registry to the claim under which the property was sold; that is all Sentell did. He and the sheriff were required to go by the record in the Mortgage Office, showing what liens were recorded against the property. None of those lien-holders were a party to the suit of Sentell & Co. against Mrs. Randolph, or to the execution under which the property of Mrs. Randolph was sold. The fund in Sentell's hands was retained by him as purchaser to hold him harmless from such claim of lien; and by the payment into court of the sum so retained by him, he was relieved of any obligation whatever by virtue of his purchase; and the lien-holders and the debtor of the claims secured by lien, together with other creditors of that debtor, who had a right to contest the amount and validity of liens which were claimed to be prior to theirs, had a right to come in and be heard as to whom the fund should go to. This was the theory upon which the bill of interpleader was filed and allowed, and upon which the court below entered a decree. It would be inequitable to hold that Sentell had bound himself to pay the full amount of the Rhea debt, when that debt had already been paid, except a small balance, so far as Mrs. Randolph was concerned. Sentell knew nothing of what was due on the debt, and could not make Mrs. Randolph owe more than she did owe, and could not consent to pay her money to an alleged creditor of hers to whom she really owed a very small sum. The decree is entirely in accordance with equity, the law, and the facts, and should be affirmed.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

As Martha Groves and W. J. Groves and Pogue, adminis-

trator, are the only appellants, the correctness of the decree
in their favor and against Mrs. Randolph and Sentell is not
before us. In this regard that decree is final. *The Stephen
Morgan,* 94 U. S. 599.

The first apparent question is the correctness of the decree,
holding that certain payments which were made on the note
should have been imputed to Mrs. Randolph's portion, instead
of to the note as a whole. The payments which were thus
imputed by the lower court were those made subsequent to
the notarial act of 1873, in which the parties fixed the princi-
pal of the note at $7577.34. As to the payments made prior
to this date there is no dispute in the record, as they are all ad-
mitted to have been made in equal proportions from the funds
belonging to Mrs. Stark and to Mrs. Randolph.

The first question necessary to be determined is, was the
note, under the Louisiana law, a joint or a solidary obligation.
A joint obligation under the law of Louisiana binds the
parties thereto only for their proportion of the debt, (Civil
Code, Arts. 2080, 2086,) whilst a solidary obligation, on the
contrary, binds each of the obligors for the whole debt. The
note was clearly a joint note, and not a solidary one. Soli-
darity, under the law of Louisiana, must be expressly stipu-
lated, and is never presumed. La. Civil Code, Art. 2093.
We consider it unnecessary, however, to pass upon the ques-
tion of imputation of payments, because of our conclusions
upon another branch of the case. The issue between the
parties is not as to the amount of the payments, but as to the
manner in which the payments should be applied. It follows,
therefore, that the controversy involves, not the sum due, but
the person by whom it is due. As we conclude that the
whole debt, irrespective of the question of whether it is due
by Mrs. Randolph or by Mrs. Stark, is payable out of the
fund, it is useless to determine how much is due by one or by
the other.

Whether the whole debt was payable out of the whole
property, or any part thereof, depends on whether the mort-
gage was divisible or indivisible under the law of Louisiana.
Says the Louisiana Civil Code: "The mortgage is a real

charge on the property bound for the discharge of the obligation. It is in its nature indivisible, and prevails over all the immovables subjected to it, and over each and every portion. It follows them into whatever hands they pass." Art. 3282.

This provision of the Louisiana Code was derived from the Code Napoleon, where its identical language is found, Code Napoleon, Art. 2114. The mortgage in this case contains nothing on its face which takes it out of the general rule. The parties " severally declare" that they are indebted, etc., and that they do " hereby mortgage to and in favor of the said Rosetta Rhea, represented herein by her attorney in fact, the property described in the deed." There is no stipulation in the act showing in the remotest degree an intention to mortgage separately an undivided half of the property for an undivided half of the debt. Thus, on the face of the act, it is a mortgage of the whole property for the whole debt. It was in the power of the contracting parties to have stipulated against indivisibility, and that they failed to do so is self-evident. The provision of the Code is that indivisibility is " in the nature of a mortgage," therefore not of its essence. The commentators on the Code Napoleon agree that indivisibility can be avoided, even where the parties join in a common act of mortgage by stipulating that the mortgage is to be divisible. Laurent, in his Principes de Droit Civil Français, thus states the rule : " All the authorities teach the doctrine that the law, in saying that a mortgage is indivisible by its nature, intends simply thereby to declare that it is not so indivisible in its essence. From this it is concluded that parties may by their conventions stipulate to the contrary. The right of the parties to make such agreements in relation to the divisibility of the mortgage as they deem proper cannot be denied, because indivisibility rests upon intention." (Vol. 30, page 159 ; see also Rôdière On Indivisibility, paragraph 466.) Paul Pont, in his treatise On Privileges and Mortgages, thus states it : " The words ' in the nature of ' have a significance which is applied to them sometimes in other provisions of the law. Thus, the law says that indivisibility

is in the nature of a mortgage, in the same way that it is provided that warranty is in the nature, not in the essence, of contract of sale. And because indivisibility is purely a matter of intention, it can be controlled by the will of the parties." (Vol. 1, page 321, paragraphs 331 and 332.)

These expositions of the civil law writers are persuasive as to the proper construction of the Louisiana Code. *Virterbo* v. *Friedländer*, 120 U. S. 707, 728. Indeed, by the strongest possible analogy, they have been adopted by the Louisiana courts. Thus, a vendor's privilege, under the law of Louisiana, is " in the nature " of the contract of sale. The rule there as to this privilege is that, where a sale is made and the privilege is not excluded by express agreement or by implications clearly deducible from the language of the parties, it is implied to exist, as it is of the " nature of the contract." *Boner* v. *Mahle*, 3 La. Ann. 600.

The parties, then, having had the power, in contracting the mortgage, to exclude indivisibility, and not having done so, indivisibility applies, not alone as a result of their silence, but also because, being the general rule and of the nature of the contract, it exists unless excluded by the express terms or by plain " implication deducible from the contract." It is urged, however, that, as the obligation secured by the mortgage was joint, therefore the mortgage itself must necessarily have been joint. The proposition confounds the nature of the principal obligation with that of the accessory contract of mortgage. That the divisibility of a debt does not necessarily import the divisibility of the mortgage securing it, is unanimously held by the civil law writers. " Under the theory of the law the indivisibility of the mortgage has no reference to the nature of the principal obligation. Thus, there may be a division of the obligation either between joint creditors or joint debtors, or between the heirs of joint creditors and joint debtors." (Paul Pont, vol. 1, page 33.) Laurent, in speaking on the same subject, says: " Thus, if the debt is discharged in part, or is divisible, it has no influence whatever upon the mortgage. This will subsist in its entirety, although the debt may be extinguished in part, and although a third

possessor of the immovable mortgage may be liable only personally for a portion of the debt. We thus see that the indivisibility of the mortgage does not render the obligation itself indivisible. Where the obligations are joint they may be divided, actively or passively, between the heirs of the creditor and the heirs of the debtor." (Laurent, vol. 30, page 151; same page, paragraph 177.) (See also Rodière, page 167 *et seq.*)

The whole subject was at an early date considered by the French Court of Cassation. Certain persons gave a power of attorney to an agent, authorizing him to contract a debt and consent a mortgage. The agent borrowed the money and gave the mortgage. When the mortgage came to be enforced the debtors defended on the ground that the agent had consented a solidary debt when he had only the power to consent a joint one; that, therefore, not only was the debt joint, but the mortgage securing it divisible. The court found that the power only authorized the contracting of a joint debt; but it held that as the power authorized the agent to consent a mortgage, and the mortgage was in its nature indivisible, the debt was joint; but the indivisible mortgage securing it remained and was in force. (Cassation, May 6, 1818, referred to and quoted in Paul Pont, vol. 1, p. 328.)

It has been contended that a different rule has been established in Louisiana. We are referred, in support of this proposition, to *Walton & Kemp* v. *Lizardi*, 15 La. 292; and *Erwin* v. *Greene*, 5 Rob. (La.) 70. These cases, instead of supporting the contention, we think refute it. In the *Walton* case several persons had bought separate undivided portions of a square of ground. To evidence their obligations to pay the purchase price, they issued their separate notes for their respective shares, and secured them by one act of mortgage upon the property. Some of the purchasers paid their notes, and others did not. Foreclosure proceedings were commenced upon the unpaid notes, against the whole property, and the issue presented was whether the mortgage was divisible or indivisible. The court held, after a critical examination of the contract, that upon its face it stipulated that the mortgage

should be divisible, and not indivisible. It said that each of the parties had given his separate notes for his separate obligation, and that the agreement between them and the vendor was that the notes should be secured by a special mortgage on "each of the lots for which the same should be given in payment." The language of the mortgage in that case was as follows : " We, in order to secure the following described notes, *jointly effect, mortgage, and hypothecate ;*" again, "and the said purchasers, each in proportion of their respective shares and interest in said property, do hereby confess judgment in favor of said parties ; " again, "now the said parties do hereby agree that a sale of said ground shall be made in favor of . . . and in the following proportions." The facts clearly justified the court in saying "from the particular care which the parties appear to have taken to distinguish their proportionate interest in the property, as well as in the payments for which they respectively gave their separate obligations," their intention was clear to create a divisible and not an indivisible mortgage.

The facts in *Erwin* v. *Greene* were very similar to those just referred to. There the court said : "Each of the obligors promised to pay his portion of the price for which he gave his separate notes, and each took care to distinguish and designate the proportion of their respective interests in the property."

These cases, by converse reasoning, confirm the rule of indivisibility as applied to the contract with which we are dealing. Indeed, we think this contract is controlled not by the foregoing cases but by *Potts* v. *Blanchard*, 19 La. Ann. 167, 168, and *Stewart, Hyde & Co.* v. *Buard*, 23 La. Ann. 411, 415.

In the first case, certain heirs sold their undivided interests in land and the vendees gave their notes as evidence of their obligation to pay the purchase price, and secured the same by mortgage upon the property. The question was whether the mortgage thus given covered the whole of the property or a part. The court said: "The question presented is one of the construction of the act of mortgage given by the purchasing

heirs to the vendors. It is, whether or not the whole property described in the act of sale and mortgage is covered by the mortgage or only the proportion of interest sold. We think there can be no doubt that the mortgage was intended to actually cover the whole property subject to the mortgage." Referring to the act of mortgage, it further said: "The property was fully described in the act; . . . it does not say *proportion sold*, but the property is described and the description is of the *whole property.*"

In the latter case, (23 La. Ann.,) separate notes were given to evidence the price of undivided interests. These notes were secured by mortgage upon the whole property, and the court held the mortgage to be indivisible. It is contended that even although indivisibility of mortgage is the rule, as the parties have the power to stipulate for divisibility, therefore we must not confine our view to the act of mortgage, but must look beyond its terms to ascertain the intention of the parties. If in so doing we find their intention was to make a divisible mortgage, such intention should be enforced. Whether intention can be arrived at beyond the act of mortgage itself, where the party seeking to enforce the mortgage is the innocent third holder of negotiable paper, is a question upon which we express no opinion. The paper here is in the hands of the original holder. If we resort to the intention of the parties as derived from their situation in order to interpret the mortgage, we could reach no different conclusion. We have seen that the joint nature of the obligation does not negative the indivisibility of the mortgage by which the obligation is secured. The very purpose for which the mortgage was given in this case furnishes a cogent reason why the mortgage should have been indivisible. The consideration of the debt which it secured was the purchase price of movable property — mules, cane, and agricultural implements — situated, at the time of sale, on the Leinster plantation. By the very fact of the purchase of these things by the owners of the plantation they became incorporated with the plantation and constituted an integral part thereof. The Louisiana Code declares that " things which the owner of a

tract of land has placed upon it for its service and improvement are immovable by destination," . . . and among the things enumerated are "cattle intended for cultivation, implements of husbandry, seeds, plants, etc." La. Civil Code, Art. 468. It follows, then, from the nature of the things purchased, they became incorporated with the whole plantation upon which they were situated. Being thus indivisibly united with the whole thing, it is reasonable to draw the conclusion that the intention of the parties was that the security given for the purchase price would rest upon the entire entity, of which the things sold became a part by operation of law. If the parties to the contract did not intend such contingency, it could have been readily provided against by a stipulation in the act of mortgage. All the conduct of the parties subsequent to the granting of the mortgage during the long term of years over which its payment was extended indicate that they considered the mortgage covered the whole property indivisibly.

Concluding that the mortgage was indivisible, the only remaining question is, did the fact of the voluntary partition of the property covered by the mortgage operate to prevent the mortgage creditor from enforcing his mortgage against either part thereof. The negative of this proposition necessarily results from the doctrine of indivisibility. The writers on the French Code, which is in this regard identical with the Louisiana Code, are unanimous on the subject. Says Laurent (vol. 30, p. 157): "Our code and our law of mortgages have borrowed from Dumoulin the formula which characterizes the effects of indivisibility. 'The mortgage subsists in its entirety upon all the properties affected, upon each of them and upon each portion of them.'" Pont says: "It is, then, admitted that a creditor, having a mortgage upon several pieces of immovable property, can, in consequence of indivisibility, exercise the whole sum of his rights against any particular piece thereof without giving rise to a right on the part of a special mortgage creditor subsequently inscribed to compel him to do otherwise." (Vol. 1, p. 330.) These principles taught by the civil law commentators are settled in the jurisprudence of

France. See Cassation, March 4, 1833; Dalloz, 1833, vol. 1, p. 35; Cassation, December 24, 1844; Journal du Palais, 1844, vol. 1, p. 98; idem, 1846, vol. 2, p. 427. See also authorities quoted by Paul Pont in his treatise on mortgages, vol. 1, p. 330, in footnote. A like rule is the settled law of Louisiana. *Pepper* v. *Dunlap*, 16 La. 163; *Adams* v. *Lear*, 3 La. Ann. 144; *Freret* v. *Freret*, 31 La. Ann. 506; *Bagley* v. *Tate*, 10 Rob. (La.) 45; *Powell* v. *Hayes*, 31 La. Ann. 789, 793, 794. In *Powell* v. *Hayes*, the issue involved not only the right on the part of the second mortgage creditor or third possessor to compel the holder of the first mortgage to proceed against the whole property, but also the question of subrogation. The first mortgage creditor had released a portion of the property, and sought to hold the remainder for the entire amount of his claim. To this the third possessor objected, not alone upon the ground that the proceeding must be against the whole property, but also on the ground that he was entitled to subrogation to all the rights of the first mortgage creditor, which he could not have by reason of the partial release of the first mortgage. Both these positions were held to be unsound. As to the first, the court said: "In *Bagley* v. *Tate*, (10 Rob. 45,) it was held that the plea of discussion cannot be opposed to a creditor holding a special mortgage (C. P. 73, C. C. 3367); nor can a third possessor of property specially mortgaged for a debt for which other property is also bound require that it shall be liable only for a *pro rata* portion of the debt. Each and every part of the property mortgaged is liable for each and every portion of the debt." Considering the claim of subrogation, the court said: "It may be that the third possessor, having an interest in discharging the debt will, upon payment thereof, be entitled to subrogation to *the then existing rights* of the mortgage creditor. . . . He" (the third possessor) "is under no obligation to pay the creditor, and when he does pay, he must be satisfied with a subrogation *to these rights as they exist*. We cannot see how the rights of a mortgagee may be affected, or put *in duriori casu* by the circumstance of there being a second mortgage or a sale of the mortgaged premises," etc.

Applying these principles, it is evident that the entire proceeds of the sale of the mortgaged property or a part thereof were stricken with the entire mortgage, and that the creditor could not be compelled to divide his security in consequence of the voluntary partition of the property made after the mortgage was inscribed. Nor does it affect this question that Sentell & Co. in liquidation were junior mortgage creditors on that part of the mortgaged property which belonged to Mrs. Randolph. As the second mortgage creditor, or third possessor, of the property, Sentell could not lawfully complain of the exercise by the first mortgage creditor of his rights against a part of the property mortgaged, and was only entitled by subrogation to the rights of the first mortgage creditor as they existed at the time of the foreclosure proceedings.

The Louisiana Code provides that subrogation takes place of right —

"1st. For the benefit of him, who, being himself a creditor, pays another creditor whose claim is preferable to his by reason of his privileges and mortgage.

"2d. For the benefit of the purchaser of any immovable property who employs the price of his purchase in paying the creditor to whom this property was mortgaged.

"3d. For the benefit of him, who, being bound with others or for others for the payment of the debt, had an interest in discharging it." (Article 2161.)

Of course, nothing in this opinion affects any rights of subrogation to which either Sentell & Co. or Mrs. Randolph may be entitled under the laws of Louisiana, as a consequence of the payment of the amount due on the mortgage note out of the fund.

It is true, as the junior mortgage creditor interested in the fund, Sentell & Co. had the right to plead prescription as to the principal obligation, in order thereby to defeat the rights of the first mortgage creditor. "Creditors and also other persons who may have an interest in the acquiring of an estate or the extinguishment of an obligation by prescription, shall have the right to plead it, even in case the person claiming such estate or bound by such obligation renounces such right of

prescription." (La. Civil Code, article 3466.) The same code, however, (article 3463,) provides that courts shall not supply the plea of prescription. There is no plea of prescription in the record, unless we hold that such a plea results from the general answer of Sentell & Co. in liquidation that they were entitled to a subrogation, which they could not obtain because the portion of the debt due by Mrs. Stark was prescribed. If this be treated as a technical plea, the record contains abundant evidence showing such interruptions of prescription as prevent the operation of the statute of limitations. It is immaterial whether the payments made by Stark, as the agent of Mrs. Stark and of Mrs. Randolph, were made with the money of Mrs. Randolph or with the money of Mrs. Stark. At the time these payments took place such acknowledgments were made as conclusively interrupted prescription. "Prescription," says the Louisiana Code, article 5320, "ceases likewise to run whenever a possessor makes an acknowledgment of the right of a person whose title they prescribe."

We conclude by considering the decree of the court below allowing the solicitor of Sentell & Co. in liquidation a fee from the fund. The general rule is that a party who has an interest in the subject-matter of the suit cannot file a bill of interpleader, strictly so called. In fact, the assertion of perfect disinterestedness is an essential ingredient of such a bill. *Killian* v. *Ebbinghaus*, 110 U. S. 568, 572; *Mitchell* v. *Hayn*, 2 Sim. & Stn. 63; *Bedell* v. *Hoffman*, 2 Paige, 199; *Atkinson* v. *Manks*, 1 Cowen, 691.

Sentell was a member of the firm of Sentell & Co. in liquidation. That firm was practically the real claimant of the fund, and would necessarily be a beneficiary from the successful issue of the controversy in favor of Mrs. Randolph. True, in Louisiana, the civil law regards a partnership as a different juridical entity from the members who compose it. There is, however, no averment in the bill or proof in the record that the firm in liquidation was insolvent or that Sentell had no residuary interest in its assets. The presumption of interest resulting from the partnership remains until rebutted by averment or proof. Sentell was therefore in the

position where he must be presumed to have a substantial, although not direct interest in the result of the litigation. Though it was allowable when so situated to file a bill in the nature of a bill of interpleader, (*Bedell* v. *Hoffman, supra,*) we think it clear that his ultimate interest prevents him from being allowed his solicitor's fee from the fund dedicated to the payment of the mortgage, thereby diminishing the security of the mortgage creditor.

The decree is reversed, and a decree is rendered in favor of Martha Groves and William J. Groves, directing the payment out of the fund of $4873, with interest at eight per cent from March 5, 1884, until paid, and costs of this and the court below.                                                    *Reversed.*

MR. JUSTICE JACKSON, not having been present at the argument, took no part in the decision of this case.